*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0182P (6th Cir.)
File Name: 01a0182p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

DANA CORPORATION,
  *Plaintiff-Appellee,*

  *v.*

CELOTEX ASBESTOS
SETTLEMENT TRUST,
  *Intervenor-Appellant,*

FIREMAN'S FUND INSURANCE
COMPANIES, et al.,
  *Defendants.*

Nos. 99-4493/4494

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
Nos. 83-01153; 85-07491—James G. Carr, District Judge.

Argued: March 7, 2001

Decided and Filed: June 4, 2001

Before: KEITH, SILER, and CLAY, Circuit Judges.

————————————

**COUNSEL**

**ARGUED:** Matthew Gluck, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, New York, New York, for

1

Appellant.  Mark I. Levy, HOWREY, SIMON, ARNOLD &
WHITE, Washington, D.C., Richard S. Walinski, COOPER,
WALINSKI, & CRAMER, Toledo, Ohio, for Appellee.
**ON BRIEF:**  Matthew Gluck, Barry G. Sher, FRIED,
FRANK, HARRIS, SHRIVER & JACOBSON, New York,
New York, Joan C. Szuberla, Theodore M. Rowen,
SPENGLER NATHANSON, Toledo, Ohio, for Appellant.
Richard S. Walinski, COOPER, WALINSKI, & CRAMER,
Toledo, Ohio, Mark I. Levy, John Briggs, HOWREY,
SIMON, ARNOLD & WHITE, Washington, D.C., for
Appellee.

————————————

## OPINION

————————————

CLAY, Circuit Judge.  This is a consolidated appeal.  In
**Case No. 99-4494**, Intervenor, Celotex Asbestos Settlement
Trust ("the Trust"), appeals from the district court's order
entered on August 20, 1999, granting summary judgment to
Plaintiff, Dana Corporation ("Dana"), on Dana's suit for
declaratory judgment, while also concluding that Dana did not
owe any indemnification to the Trust for asbestos-related
losses and liabilities.  The Trust's indemnification claims
were based on the terms of a Stock Purchase Agreement
between Dana and Philip Carey Corporation of Ohio ("Philip
Carey") (a predecessor in interest to the Trust), pursuant to
which Dana sold its subsidiary, Smith & Kanzler Company
("S&K"), to Philip Carey.

In **Case No. 99-4493**, the Trust appeals from the order
entered by the district court on October 25, 1999, granting
permanent injunctive relief to Dana, thereby enjoining the
Trust from representing that it had any right of
indemnification against Dana and making it a requirement for
payment of valid claims that claimants to the Trust sign an
acknowledgment that they do not receive any rights against

Dana, and enjoining the Trust from instituting in any tribunal other than the district court any action against Dana.

For the reasons set forth below, we now **AFFIRM** the district court's order granting Dana summary judgment in **Case No. 99-4494**; and **AFFIRM** the district court's order granting Dana permanent injunctive relief in **Case No. 99-4493**.

## BACKGROUND

The issue at hand involves the 1969 stock transaction and agreement ("the Agreement") wherein Dana sold S&K to Philip Carey. Dana, a manufacturer of automotive parts, acquired the stock of a company called Victor Gasket and Manufacturing Company ("Victor") in 1966. At the time of the acquisition, Victor owned all of the stock of S&K. While a subsidiary of Victor, S&K manufactured various products containing asbestos. The year after Dana acquired S&K, Dana liquidated it as a separate corporation, and maintains that it held the stock of S&K as a wholly owned subsidiary. During the next seventeen-month period that Dana owned S&K, Dana contends that S&K was adequately funded and managed by its own board of directors and officers, such that S&K was not Dana's alter ego.

Philip Carey manufactured and sold products containing asbestos. On February 18, 1969, Philip Carey purchased S&K from Dana to expand Philip Carey's position in a profitable product line and to have the flexibility of two locations. The terms of the Agreement between Dana and Philip Carey regarding the sale of S&K provides the basis for the litigation in this case. Specifically, Section 6.1 of the Agreement, which is governed by Ohio law as a whole, is the section providing for indemnification and states in relevant part:

6.   *Indemnification*

6.1.  Indemnification.  The Shareholder [Dana] agrees to reimburse and indemnify Purchaser [Philip Carey] against and in respect of:

* * *

(c)   all obligations and liabilities of the Subject Corporation [S&K] whether accrued, fixed, contingent or otherwise, aggregating in excess of $10,000, arising on or before November 30, 1968 to the extent not reflected or reserved against in the Balance Sheet; . . . .

(J.A. at 370-71.)  Thus, by virtue of this provision, Dana agreed to reimburse and indemnify Philip Carey for "all obligations and liabilities" of S&K arising on or before November 30, 1968.

In a prior draft of this provision, the agreement had been drafted in such a fashion that Dana agreed to "indemnify and hold Purchaser [Philip Carey] *and the Subject Corporation [S&K]* harmless against and in respect of . . . ." (J.A. at 594-96 (emphasis added).)  Dana claims that although there is no extrinsic evidence as to why it rejected this prior draft, the logical conclusion is that Dana rejected this version of the Agreement because Dana was agreeing to an obligation that it did not have prior to selling S&K to Philip Carey; namely, to indemnify S&K and hold it harmless.

Pursuant to the Agreement, Philip Carey became the sole shareholder of S&K on February 18, 1969.  About one week later, S&K changed its name to Philip Carey Corporation; the parties distinguish between the two Philip Carey Corporations by connoting one as Philip Carey (Ohio) and the other as Philip Carey (NJ), with the latter being formerly called S&K; however, Philip Carey was the sole shareholder of Philip Carey (NJ).

Northern District of Ohio, any so-called 'Dana rights' or 'Dana liabilities.'" (J.A.II at 120.)

We agree with the district court's reasoning and conclusion.  First, like the district court, we believe that without the injunction, Dana faces the potential of having to defend countless number of lawsuits, albeit meritless, inasmuch as the issuance of Dana rights may spawn litigation by the innumerable potential claimants.  This threat far outweighs any potential harm to the Trust.  Again, like the district court, we are not persuaded by the Trust's argument that it faces the possibility of being held in contempt by the bankruptcy court because the injunction prevents the Trust from issuing Dana rights.  The confirmed plan of reorganization did not adjudicate the issue of whether the Trust was entitled to indemnification such that Dana rights were available.  That matter was properly adjudicated by the district court and has now been affirmed on appeal.  The confirmed plan only provided for the distribution of the Dana rights to the extent those rights existed.  It has been determined that they do not exist; thus, if the Trust found itself faced with a contempt citation, it would have a viable defense of impossibility thereby rendering its claim of potential harm without merit.  *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996) (finding that a party seeking to defend a contempt citation may do so by showing a present inability to comply with the court's order).

**CONCLUSION**

For the above-stated reasons, and for the reasons set forth in the district court's well-reasoned opinions, we **AFFIRM** the district court's orders in **Case No. 99-4494** and **Case No. 99-4493**.

requiring the Trust to distribute Dana rights to putative claimants went against the purpose of Judge Potter's injunction. The court found that

> [the] plan provision disregards basic principles of judicial administration, and offends fundamental policy considerations regarding consistency, certainty, and finality. It was designed to do that which Judge Potter's injunction declares cannot be done – namely, facilitate suits in a limitless number of courts by countless plaintiffs asserting the same claim, but raising a likelihood of inconsistent judgments.

(J.A.II at 117.)

Based upon its finding of potential "irreparable and irredeemable harm to Dana" and that this threat of irreparable harm greatly outweighed any potential harm to the Trust, the district court held as follows:

> Having found for Dana on the merits, I conclude that I properly and lawfully can and should enjoin the Trust from transferring "Dana rights." Doing so does not, under the present circumstances, create a conflict between this court and the plan or reorganization. Or, if such conflict exists, it arises as a result of an improper attempt to impair the efficacy of this court's preexisting injunction by a scheme designed and intended to foster multiple litigation in violation of the injunction and contrary to sound and fundamental principles and policies of judicial administration.

(J.A.II at 119-20.) In response to Dana's concern about notifying claimants about the summary judgment order as well as the injunctive relief should Dana's motion be granted, the district court fashioned a notice to be sent to all claimants informing them, in part, that "notwithstanding any provisions of the Celotex plan of reorganization to the contrary, no claimant under the plan is or will be receiving, pursuant to orders entered in the United States District Court for the

In 1970, Philip Carey merged with Briggs Manufacturing Company ("Briggs") in Michigan, and adopted the name Panacon Corporation ("Panacon"). At this point, Panacon owned all the stock of what was once called S&K because Panacon was the product of the merger between Briggs and Philip Carey, and the latter owned all the stock of S&K, or Philip Carey (NJ), as it was then known.

The Celotex Corporation ("Celotex") eventually purchased a controlling interest in Panacon. On May 30, 1972, while Celotex was Panacon's controlling shareholder, Panacon liquidated Philip Carey (NJ) and accepted all of the assets as well as the liabilities of Philip Carey (NJ). In exchange, Panacon returned to Philip Carey (NJ) all of the latter's outstanding stock, and Philip Cary (NJ) was subsequently dissolved.

The agreement between Panacon and Philip Carey (NJ) provided in relevant part:

> RESOLVED, That pursuant to a complete liquidation qualifying under Section 332 of the Internal Revenue Code of 1954, Panacon Corporation's wholly owned subsidiary, Philip Carey Corporation, a New Jersey corporation, shall effective May 30, 1972, be completely liquidated into Panacon Corporation, a Michigan corporation; that Philip Carey Corporation shall distribute all of its assets to Panacon Corporation, and *Panacon Corporation will assume all of its debts and liabilities in exchange for the surrendering up by Panacon Corporation of all of the issued and outstanding stock of Philip Carey Corporation*; and that the officers and directors of Panacon Corporation, be, and they are hereby authorized to execute any and all instruments or other papers and perform all acts necessary in order to carry out this plan of liquidation.

(J.A. at 163 (emphasis added).)

About one month later, on June 29, 1972, Panacon officially merged with Celotex, leaving Celotex as the surviving corporation. The merger agreement between Celotex and Panacon provided in relevant part:

> Section II – *Certain Effects of Merger.* At the Effective Date of the merger, the separate existence of Panacon shall cease and *Celotex shall possess all of the rights, privileges, powers and franchises both of a public and private nature of Panacon*, subject to all their restrictions, disabilities and duties, and all and singular, the rights, privileges, powers and franchises of Panacon, and all property, real, personal and mixed, tangible and intangible, and all debts due to Panacon on whatever account, and all other things in action of or belonging to Panacon, shall be vested in Celotex without further act or deed; and all property, rights, privileges, powers and franchises and all and every other interest shall be thereafter as effectively the property of Celotex as they were of Panacon, and the title to any real estate vested by deed or otherwise in Panacon shall not revert or be in any way impaired by reason of the merger herein provided for, provided that all rights of creditors and all liens upon property of Panacon shall be preserved unimpaired, and all debts, liabilities and duties of Panacon shall upon the Effective Date of the merger attach to Celotex and may be enforced against it to the same extent as if such debts, liabilities and duties had been incurred or contracted by Celotex. Any surplus which Panacon may have upon the Effective Date of the merger may be carried as surplus by Celotex.

(J.A. at 177-78 (emphasis added).)

In 1982, about ten years later, Celotex began being sued for asbestos-related tort claims that had allegedly been caused by S&K asbestos-related products. Celotex sought indemnification from Dana under Dana's 1969 Agreement with Philip Carey, claiming that the terms of the Agreement

multiple litigation; however, the district court was not persuaded by this argument. Specifically, the court opined:

> The problem with the Trust's argument is that it ignores the utter inability to recreate the status quo (*i.e.*, a single case in a single court) once the "Dana rights" are dispersed to thousands upon thousands of claimants. Even if there is no immediate or even presently perceptible risk that suit based on those right will be filed, much less filed elsewhere than here, I am persuaded that such dispersal, without more, creates significant potential for irreparable and irredeemable harm to Dana and potentially substantial disruption of the orderly administration of judicial business that injunctive relief is warranted.

(J.A.II at 118.) The district court balanced this potential harm that Dana may incur if the injunction did not issue, against that the Trust would incur if the injunction issued, and found the harm to the Trust "less palpable." The district court opined that "[n]o one's interests are served by distribution of worthless rights, and no one is harmed if something of no value is not disseminated." (J.A.II at 119.)

The court was not persuaded by the Trust's argument that if it was enjoined from issuing Dana rights to its claimants, it could not comply with the confirmed plan of reorganization and therefore faced being held in contempt by the bankruptcy court. The court first noted that if the injunction issued, it would be impossible for the Trust to comply with the provision of the plan, and that "impossibility is a well-settled defense to a charge of contempt." (J.A.II at 116.) The court also found that in light of its order granting summary judgment to Dana, as a practical matter, any Dana rights that the Trust attempted to transfer were worthless. Specifically, the court opined, "[w]hen the plan was drafted, the "Dana rights" may have had some potential value; since entry of summary judgment in Dana's favor, they have none." Moreover, the court found that the confirmed plan's provision

and grant permanent injunctive relief is the court's discretion. . . . [I]n most cases the determination whether to issue an injunction involves a balancing of the interests of the parties who might be affected by the court's decision – the hardship on plaintiff if relief is denied as compared to the hardship to defendant if it is granted . . . . [T]he main prerequisite to obtaining injunctive relief is a finding that plaintiff is being threatened by some injury for which he has no adequate legal remedy. . . . [P]laintiff must demonstrate that there is a real danger that the act complained of actually will take place. There must be more than a mere possibility or fear that the injury will occur. . . . Because injunctive relief looks to the future, and is designed to deter rather than punish, relief will be denied if the conduct has been discontinued on the ground that the dispute has become moot and does not require the court's intervention. But the court must be satisfied that there is no reasonable expectation of future injurious conduct. . . . Since a court must take into consideration the likelihood of a recurrence of the problem, plaintiff need not rely solely on defendant's assurances that it will not engage in the offensive conduct at some later date.

11A CHARLES A. WRIGHT ET AL., WRIGHT & MILLER FEDERAL PRACTICE & PROCEDURE § 2942 (2d ed. 1995).

In the matter at hand, the district court found that although Dana was not being threatened with litigation at the current time, and although the force of the summary judgment order was to deny the Trust any right to indemnification against Dana, it nonetheless remained that without enjoining the Trust from assigning "Dana rights" to claimants, Dana was being threatened with a risk of injury for which no adequate legal remedy remained by the potential for innumerable lawsuits against Dana. The Trust argued that in light of the district court's summary judgment order in favor of Dana, injunctive relief was not necessary to avoid the risk of

expressly allocated all of S&K's preclosing liabilities – including its asbestos liabilities – to Dana. Dana maintained that it was not bound to indemnify Celotex, claiming that Celotex's asbestos liabilities were direct liabilities incurred as a result of Panacon's 1972 voluntary assumption of Philip Carey(NJ)'s direct liabilities and Panacon's later merger with Celotex.

On receipt of a demand to defend from Celotex, Dana filed suit in the United States District Court for the Northern District of Ohio in 1983 against its insurers, among which was Fireman's Fund Insurance Companies, seeking a declaration of which of its insurers was obliged to defend and indemnify it in the underlying asbestos cases. On September 11, 1984, the district court ordered Celotex to be joined in the action. Pursuant to the joining of Celotex into the lawsuit, Dana filed a claim for declaratory relief against Celotex regarding Celotex's claim that Dana was bound by the Agreement to indemnify Celotex.

Thereafter, two cases involving Dana and Celotex were transferred from other districts and all three cases were consolidated in the Northern District of Ohio. Specifically, on January 22, 1985, the United States District Court for the Southern District of Georgia transferred Case No. C 85-7090 to the Northern District of Ohio, wherein Celotex and Dana were being sued for an asbestos-related bodily injury and death claim made by Jack H. Lee, and Celotex filed a cross-claim for indemnity against Dana under the terms of the Agreement. On May 2, 1985, the United States District Court for the Middle District of Florida transferred Case No. C85-7491 to the Northern District of Ohio, wherein Celotex had sought a declaration of the scope of the indemnity provision as it applied to property damage claims for removal or containment of asbestos installed in buildings.

On January 12, 1987, consolidation notwithstanding, the district court entered an order denying Celotex's motion for summary judgment on its claim for indemnity in the *Lee* case,

dismissed Celotex's claim for indemnity in that case, and entered a final judgment in favor of Dana. Upon the district court's January 12, 1987 dismissal of Celotex's claim for indemnity in the *Lee* case, Celotex refused to stipulate to a continuation of a March 25, 1986 stipulated order enjoining Celotex from instituting, directly or indirectly, new actions or claims in any court and from further prosecuting any claims currently pending in other federal courts except for the Northern District of Ohio. Dana then filed its motion for a preliminary injunction in the Northern District of Ohio, seeking to continue the effects of the stipulated order, which the district court granted on October 29, 1987. *See Dana Corp. v. Fireman's Fund Ins. Cos.*, No. 87-4012, 1988 WL 132550, at **2 (6th Cir. Dec. 13, 1988) (unpublished *per curiam*). Celotex appealed the district court's order granting Dana injunctive relief, and this Court affirmed. *See id.*

Celotex also appealed the district court's order in the *Lee* case; however, on October 12, 1989, Celotex filed for Chapter 11 bankruptcy reorganization in the United States Bankruptcy Court for the Middle District of Florida and, as a result, the bankruptcy court stayed all litigation involving Celotex. Celotex's plan of reorganization was confirmed in 1998, and the Trust was created as Celotex's successor. The plan of reorganization provided that the assets of Celotex, including whatever rights and claims Celotex may have under the Agreement and its indemnification provision, were transferred to the Trust. The Trust thereafter voluntarily dismissed the pending appeal in *Lee*, leaving for adjudication the consolidated cases that were before the Northern District of Ohio. The Trust was substituted for Celotex in the consolidated cases.

The Trust and Dana each filed motions for summary judgment in the consolidated matter. The Trust filed a motion for summary judgment on the basis of the indemnification provision in the Agreement; and Dana filed a cross-motion for summary judgment as to that provision, as well as motions for

Upon Dana's motion, the district court enjoined the Trust from "representing to any asbestos claimant against the Celotex Asbestos Settlement Trust that the Celotex Asbestos Settlement Trust has any right of action against the Dana Corporation to assign, transfer, or otherwise to convey [Dana rights]," and from "instituting or prosecuting, directly or indirectly, in any tribunal or court (federal, state, foreign, or otherwise) other than this court, any action or claim against the Dana Corporation . . . based on any right of action putatively assigned or otherwise derived or obtained from or through the Celotex Asbestos Settlement Trust." (J.A.II at 123-24.) In connection with this order, the district court also made it a requirement that claimants to the Trust sign an acknowledgment that they do not receive any rights against Dana.

The district court granted Dana's motion for permanent injunctive relief in part upon the premise that this Court may reverse the district court's grant of summary judgment to Dana thereby "restoring" the Trust's Dana rights, and because this Court may not uphold the findings of contempt against the Trust in *Anderson*, thereby rendering the 1987 injunction without force. However, the district court also found that even in the face of its summary judgment order in favor of Dana being affirmed, the threat of potential harm to Dana was significant and real enough for the injunction to issue. The Trust argues that these reasons may not serve to support the issuance of the injunction inasmuch as they are based upon speculation and not upon the immediate threat of injury required for an injunction to issue. The Trust also argues, as it did before the district court, that by issuing the injunction, the Trust is unable to comply with the plan of reorganization as confirmed by the bankruptcy court, such that the Trust is now faced with being held in contempt. We disagree with the Trust and hold that the district court properly issued the permanent injunction.

Perhaps the most significant single component in the judicial decision whether to exercise equity jurisdiction

contract construction. *See Ford Motor Co. v. John L. Frazier & Sons Co.*, 196 N. E. 2d 335, 337 (Ohio Ct. App. 1964).

### 4.  S&K Comp's $900,000 Note owed to Dana but Transferred to Philip Carey

The district court found that the parties' treatment of an S&K note owed to Dana but transferred to Philip Carey without recourse against Dana also supported its decision and cut against the Trust's position. The district court reasoned that to read the indemnification provision as obligating Dana for all of S&K's pre-closing obligations and liabilities, as the Trust contends, would conflict with the parties' agreement for S&K to transfer its $900,000 note to Philip Carey without recourse. We agree that it is unlikely that the parties would not have treated the note in this fashion if Dana was to be held liable for all of S&K's liabilities under the Agreement.

In summary, the district court properly found that under § 6.1(c) of the Agreement, Dana's obligation to indemnify did not trigger until such time that Philip Carey was damnified. Because three years after Philip Carey bought S&K's stock from Dana, Philip Carey– then called Panacon after merging with Briggs – merged with Celotex, S&K's liabilities at the point when damnification occurred were Celotex's own liabilities, thereby making the district court's summary judgment dismissal of the matter in favor of Dana proper.

## II.  Case 99-4493: Motion for Permanent Injunction

In *South Central Power Company v. International Brotherhood of Electrical Workers, Local Union 2359*, this Court opined that "[a] district court's decision to grant or deny a permanent injunction is reviewed under several distinct standards. Factual findings are reviewed under the clearly erroneous standard, legal conclusions are reviewed *de novo*, and the scope of injunctive relief is reviewed for an abuse of discretion." 186 F.3d 733, 737 (6th Cir. 1999) (citing *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998)).

summary judgment on the basis of *res judicata*, equitable discharge and release, and late notice.

The district court denied the Trust's motion for summary judgment, and granted Dana's motion for summary judgment. The court added in its order that "summary judgment shall be entered in favor of Dana on the basis that Panacon's merger of Philip Carey of New Jersey into itself materially altered the risks to Dana as an indemnitor, thereby relieving Dana of any obligation to indemnify Philip Carey or its successors in interest, including Celotex and the Celotex Trust, under the indemnification agreement." (J.A. at 129.) In a footnote to the order, the district court added as follows:

> No decision is reached with regard to the other summary judgment motions and issues, because the decisions in favor of Dana on the issues of the interpretation of the indemnification agreement and the effect of Philip Cary of New Jersey's merger into Panacon resolve to finality the litigation between Dana and the Celotex Trust. To enter final judgment in this case, a decision as to the other issues is, therefore, unnecessary. As importantly, the issues raised by Dana's motion for equitable discharge due to the failure of the Celotex Plan of Reorganization to acknowledge and accommodate Dana's rights as a putative indemnitor are complex and novel. Furthermore, those issues relate, at least in part, to the relationship between this Court and the Bankruptcy Court with its specialized jurisdiction. It is appropriate, accordingly, to refrain from addressing those issues in an advisory manner.

(J.A. at 129.) In Case No. 99-4494, the Trust now appeals the district court's decision granting summary judgment to Dana, and denying summary judgment to the Trust.

Following the district court's entry of summary judgment in Dana's favor, the parties requested entry of final judgment pursuant to Fed. R. Civ. P. 54(b). Dana also filed a motion

for a permanent injunction, claiming that without this relief, it feared that dispersal of "Dana rights" to tens, if not hundreds of thousands, of claimants by the Trust would ultimately result in renewed efforts by claimants to litigate claims under the indemnity provision elsewhere than the Northern District of Ohio. Dana believed that fragmentation of the Trust's unitary claim under the indemnity agreement may, albeit in some presently unforeseeable form and forum, result in its being forced to litigate manifold cases in multiple jurisdictions. Dana maintained that if such an event were to occur on even a small scale, Dana would be disadvantaged by the expenses and uncertainty of duplicative litigation and prejudiced by the risk of inconsistent judgments.

In ruling on Dana's motion for permanent injunctive relief, the district court began by setting forth the principal issues involved:

1. Whether the Trust should be enjoined from transferring "Dana rights" pursuant to the provisions of the Plan; and

2. The nature of the notice that should be given to claimants about this court's prior orders and decisions, whereby all litigation relating to the indemnity provision may be brought only in this court and summary judgment has been entered in Dana's favor on the merits of the Trust's claim under the indemnity provision.

(J.A.II at 108.)[1]  The district court then noted that Dana's fears originated "in the persistent desire of counsel for asbestos claimants to sue Dana in disparate courts of their choice, rather than in a single court." The district court cited the *Lee* case which originated in Georgia and the suit that

---

[1] We shall refer to the joint appendix submitted in connection with Case No. 99-4493 as "J.A.II" for ease of reference.

simply an indemnification provision. *See, e.g., Wilson*, 9 Ohio St. at 469; *Midwest Specialities, Inc.* 940 F. Supp. at 1168 ("Under Ohio law, . . . [t]he right to indemnity and/or contribution becomes complete and enforceable only upon payment by the claimant satisfying the whole of the obligation.")

### 2.  Section 7.6 – "Binding Effect, Benefits"

The district court found that § 7.6 of the Agreement also demonstrated the parties' intent to limit Dana's indemnification obligation. In § 7.6, the parties agreed that neither S&K nor anyone else would benefit from the agreement between Dana and Philip Carey:

> [N]othing in this agreement express or implied is intended to confer on any person, other than the parties hereto, any rights, remedies, agreements, understandings, obligations, or liabilities under or by reason of this Agreement.

(J.A. at 371-72.) The practical effect of this section is that it demonstrates that under the terms of the Agreement, S&K was not relieved of its obligations and liabilities for which it was not an indemnitee.

### 3.  Section 2.8 – "Absence of Undisclosed Liabilities"

In this section, Dana warranted that in accordance with generally accepted accounting principles, S&K's balance sheet made full and adequate provision for all obligations and liabilities, fixed or contingent, of that company, and that no such obligations or liabilities in an aggregate amount greater than $10,000 were not reflected or reserved against in the balance sheet. Therefore, the effect of this section is to allocate a category of S&K's liabilities to Philip Carey and, as found by the district court, interpreting the indemnification agreement provision as making Dana liable for all of S&K's liabilities would render § 2.8 surplusage, in violation of

This conclusion is supported by the plain language of § 6.1(c) as well as the other provisions of the contract. We are not persuaded otherwise by the Trust's attempt to distinguish between "loss" and "liability" for purposes of determining when the obligation to indemnify is triggered.

### 1.    Other Subsections of Section 6.1

Subsection (a) and (b) of section 6.1 also support the conclusion that subsection (c) is a simple indemnification agreement and not an agreement to pay. For example, the language of subsections (a) and (b) reads that Dana agrees to "reimburse and indemnify" Philip Carey "against and in respect of,"

> (a) any loss, liability or damage to [Philip Carey] or [S&K], in excess of the reserve for bad debt loss, if any, reflected in the Balance Sheet, resulting from the noncollection of any receivable (other than receivables owing by [Philip Carey]) referred to in Section 2.2(b) hereof;

> (b) any loss, liability or damage to [Philip Carey] or [S&K] arising from any breach of any representation or warranty contained herein . . . .

(J.A. at 371.) These two provisions, aside from expressly agreeing to indemnify S&K as well as Philip Carey, expressly state the type of harm that triggers the duty to indemnify; namely, "loss, liability, or damage . . . for bad debt loss . . . reflected in the Balance Sheet," § (a), or "loss, liability, or damage . . . arising from any breach of any representation or warranty," § (b), thus differentiating these subsections from (c) which does not provide for the nature of the harm that must occur as precondition for indemnification. As noted above, and as found by the district court, the additional language in subsections (a) and (b) as opposed to subsection (c) indicates that the parties intended to limit the application of subsection (c), and that under Ohio law, subsection (c) is

Celotex filed in the Middle District of Florida against Dana as examples of the type of split litigation that Dana feared.

The district court also made note of the fact that Celotex did not seek leave to have its claim against Dana litigated on the merits in the bankruptcy proceedings, but instead facilitated the attempt of Anderson Memorial Hospital to seek recovery against Dana on the indemnity provision through a lawsuit in South Carolina state court, in derogation of the 1987 injunction. The district court found that in order to accomplish its end of suing Dana in South Carolina state court, Celotex assigned a portion of its claim against Dana to a putative class of asbestos property damage claimants. The district court opined that the express purpose of that assignment was to enable counsel for Anderson to pursue Dana under the indemnity provisions of the Agreement in South Carolina. The district court also expressly noted that in response to the show cause motion filed by Dana against Anderson in the South Carolina suit, Anderson was found in contempt of the 1987 injunction. The district court also took note of the fact that "the parties and lawyers in the Chapter 11 proceeding created the mechanism for claim splitting as presently found in the plan . . . . [t]hereby [allowing] Celotex's unitary claim against Dana to be atomized into thousands of separate, free-standing claims assigned to individual asbestos claimants." (J.A.II at 110.) The district court expressed its concern that "[n]o similar provision applies under the plan to Celotex's insurers. From the record presently before this court, it appears that no similar provision has ever been included in other asbestos-related bankruptcy reorganization plans." (J.A.II at 111.) The court opined:

> No one suggests any other explanation for this aspect of the plan other than a desire to deny Dana the protection of [the 1987] injunction and deprive it of a fair opportunity to litigate the merits of the indemnification claim to finality in a single proceeding in a single court. I find that the motivating purpose of claim splitting among tens, if not hundreds of thousands of Celotex's

claimants is to compel Dana to accede to the demand that it settle the Trust's claim for indemnity under the S&K stock purchase agreement.

(J.A.II at 111.)

The district court thereby granted Dana's motion for injunctive relief as well as the parties request for Rule 54(b) certification of its order granting Dana summary judgment. It is from the district court's order granting Dana permanent injunctive relief that the Trust now appeals in Case No. 99-4493.

## DISCUSSION

### I. Case No. 99-4494:  Motions for Summary Judgment

This Court reviews a grant of summary judgment *de novo*. *DePiero v. City of Macedonia*, 180 F.3d 770, 776 (6th Cir. 1999).   Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

The district court held that the indemnification provision as provided in the Agreement between Dana and Philip Carey limited Dana's obligation to instances in which Philip Carey was damnified, either by an unsuccessful defense of a claim based on a tort by S&K, or by payment of such a claim.  The district court based its holding "on the plain meaning of § 6.1(c) [the indemnification provision], whereby Dana agreed to 'reimburse and indemnify' Philip Carey for the 'obligations and liabilities' of Smith & Kanzler Company." (J.A. at 140.)  The district court also based its holding on other provisions in the Agreement which were more expansive than § 6.1(c) in that they benefitted Dana, Philip Carey, and S&K alike.  However, with regard to § 6.1(c), the

accrual."); *see also Midwest Specialities, Inc. v. Crown Indus. Prods. Co.*, 940 F. Supp. 1160, 1168 (N.D. Ohio 1996) ("Under Ohio law, . . . [t]he right to indemnity and/or contribution becomes complete and enforceable only upon payment by the claimant satisfying the whole of the obligation.")

An Ohio bankruptcy case also makes clear the distinction between a contract to indemnify and a contract to pay, noting that the obligation to pay under the former is not triggered until the indemnitee is damnified:

> If an agreement is to simply indemnify, and nothing more, then damage must be shown before the indemnitee is entitled to recover.  On the other hand, however, if there is an agreement to stand for a debt or to pay a sum certain, then it is no defense that the indemnitee has suffered no loss.

*In re Highland Group, Inc.,* 136 B.R. 475, 478 (Bankr. N.D. Ohio 1992).  *Highland* involved a contract between a retailer and one of its suppliers, and provided that the supplier "will indemnify and hold harmless J.C. Penney and J.C. Penney's agents and employees from and against any and all loss, liability or damage." *Id.* at 478-79.  The bankruptcy court found that because the language of the agreement did not contain any language to suggest that it stood for a debt or to pay a sum certain, the contract by its terms was one for indemnity.  *Id.* at 479.

Here, the contract provides that Dana would "reimburse and indemnify" Philip Carey; therefore, as found by the district court, the contract was one for indemnification and, under Ohio law, Dana's obligation to pay was not triggered until Philip Carey was damnified.  In other words, Dana could only be successfully sued under the indemnity agreement for some loss or obligation imposed on Philip Carey for the tortious conduct of S&K – i.e., when Philip Carey was damnified as a result of S&K's conduct. *See Wilson*, 9 Ohio St. at 469.

the just claims against said firm J. M. Tooker & Co., then this obligation is to be void and of no effect; otherwise to remain in full force and virtue.

*Wilson*, 9 Ohio St. at 469.   The Supreme Court of Ohio looked at this provision and opined that

[t]he phrase 'settle up and liquidate,' in the connection of this bond, taken in connection with the accompanying recital, is equivalent to the word pay and imposes the obligation to pay all the debts of the late firm of J. M. Tooker & Co., and is readily distinguishable from an obligation to indemnify against a liability to pay. And the doctrine seems to be now well established, by a current of decisions both in this country and in England, *that if there be a contract to indemnify simply, and nothing more, then damage must be shown before the party indemnified is entitled to recover*; but if there be an affirmative contract to do a certain act, or to pay a certain sum or sums of money, then it is no defense to say that the plaintiff has not been damnified; and that the measure of damages in such case is the amount agreed to be paid, or the proper expense of doing the act agreed to be done.

*Id.* at 469-70 (emphasis added).  In other words, the Supreme Court of Ohio held that inclusion of the phrase "settle up and liquidate" took this agreement out of the bounds of the rule that a general agreement to indemnify requires that the indemnitee be damnified before triggering the indemnitor's obligation to pay. Thus, *Wilson* supports the proposition that damages must be shown before the party indemnified is entitled to recover under a contract to indemnify which does not specify otherwise. This principle of Ohio has been repeatedly embraced since *Wilson* was decided many years ago. *See Firemen's Ins. Co. of Newark, N.J. v. Antol*, 471 N. E. 2d 831, 835 (Ohio App. 3d 1984) (Whiteside, J., concurring) ("Unlike a subrogated claim, a claim for indemnity does not arise until payment is made in the absence of an express contractual provision providing for an earlier

district court explained, the parties expressly excluded S&K as an indemnitee – as evidenced by the final language of § 6.1(c) as opposed to prior drafts of this section.

The district court rejected the Trust's reading of the Agreement – that being that pursuant to § 6.1(c) Dana agreed to be obligated for all of S&K's pre-closing obligations and liabilities – because this reading conflicted with the parties' agreement to "a) transfer Smith & Kanzler Company's $900,000 note to Philip Carey and b) allocate any undisclosed obligations and liabilities of Philip Carey which need not have been disclosed in accordance with generally accepted accounting principles." (J.A. at 140.)  The district court further opined that it was required to read § 6.1(c) in accordance with Ohio's common law of indemnification which makes clear that an agreement to indemnify differs from a commitment to pay. (J.A. at 140) (citing *Wilson v. Stillwell*, 9 Ohio St. 468, 470 (1869).) Finally, in rendering its decision, the district court was persuaded by Dana's argument that as a result of the Agreement, Philip Carey got exactly what Dana had to sell -- a wholly owned subsidiary whose liabilities could not, as a result of shareholder immunity, be imposed on the parent company, and Dana could not therefore now be required to have greater liability than what it had when it owned S&K. We agree with the district court's reasoning and conclusion.

We begin with the plain language of § 6.1(c) as it appears in final form in the Agreement:

   6.   *Indemnification*

   6.1 Indemnification.    The Shareholder [Dana] agrees to reimburse and indemnify Purchaser [Philip Carey] against and in respect of:

                                    * * *

(c)  all obligations and liabilities of the Subject Corporation [S&K] whether accrued, fixed, contingent or otherwise, aggregating in excess of $10,000, arising on or before November 30, 1968 to the extent not reflected or reserved against in the Balance Sheet; . . . .

(J.A. at 370-71.)  Accordingly, as found by the district court, the very terms of § 6.1(c), provide that Dana agreed to reimburse and indemnify *Philip Carey* for "all obligations and liabilities of the Subject Corporation [S&K];" Dana did not, however, agree to indemnify S&K for its liabilities as evidenced by a prior draft which provided as much, but was rejected.  Specifically, the prior draft provided that Dana would "indemnify and hold Purchaser [Philip Carey] *and the Subject Corporation [S&K]* harmless against and in respect of . . . ."  (J.A. at 594-96 (emphasis added).)  Therefore, by the language of the final draft as well as the what appears to be the intent of the parties, Dana agreed to indemnify Philip Carey alone for any liabilities that it incurred as a result of S&K being found to be a tortfeasor.  *See Skivolocki v. E. Ohio Gas Co.*, 313 N. E. 2d 374, 376 (Ohio 1974) (noting that the court must look to the language of the agreement to interpret the parties' intent when interpreting a contract dispute).  The Trust has offered nothing that has persuaded us to conclude otherwise.

The Trust disagrees with this reading of the Agreement and maintains that it is not necessary to look at extrinsic evidence of prior drafts because the Agreement is plain on its face.  We are not persuaded by this argument, however, where even without the extrinsic evidence of a prior draft, a logical reading of the language of the Agreement cannot be interpreted to mean that Dana agreed to indemnify S&K for its actions as a tortfeasor.  *See Lovewell v. Physicians Ins. Co.,* 679 N. E. 2d 1119, 1121 (Ohio 1997) (stating the "the construction of contracts is a matter of law to be resolved by the court"); *Carroll Weir Funeral Home, Inc. v. Miller*, 207 N. E. 2d 747, 749 (Ohio 1965) (noting that contract terms are to be given their usual and ordinary meaning).

Accordingly, having found that Dana did not agree to indemnify S&K, but instead agreed to indemnify Philip Carey for any liability that it may have suffered as a result of S&K's tortious conduct, the issue becomes what triggered Dana's obligation to indemnify.  In other words, did Dana become obligated to indemnify for S&K's tortious conduct at the time the agreement was made, or did the obligation to indemnify arise at some later dater date when damnification occurred.  The district court found that under Ohio law, Philip Carey had to suffer a damnification before Dana was required to indemnify Philip Carey for S&K's tortious conduct.

The Trust argues that the district court erred in this regard because Dana agreed to indemnify Philip Carey for all "liabilities" that it may suffer as a result of S&K's conduct, and not for all "losses," thereby rendering the triggering point of Dana's obligation at the time the liabilities accrued, and not at the point when Philip Carey actually suffered a loss. The Trust maintains that there are two types of indemnification agreements – one which covers losses thereby requiring the indemnitee to suffer an out-of-pocket loss before the indemnitor is required to pay, and one which covers liabilities thereby requiring the indemnitee to protect against liabilities when they accrue – and that because the Agreement provided that Dana would indemnify Philip Carey for any of S&K's liabilities, Philip Carey did not have to actually suffer a loss before Dana's obligation as an indemnitor was triggered. The Trust relies upon *Wilson v. Stilwell*, 9 Ohio St. 467 (1869) in support of its position. The Trust further contends that the district court's interpretation of *Wilson* was erroneous. We disagree with the Trust in all respects.

In *Wilson*, the provision in question provided:

The condition of this obligation is such that whereas the above-bounden John M. Tooker has agreed to pay all the liabilities of the late firm of J. M. Tooker & Co.  If the said John M. Tooker shall settle up and liquidate all