RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0270p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

EXEL, INC., f/u/b/o Sandoz, Inc.,

*Plaintiff-Appellee/Cross-Appellant,*

*v.*

Nos. 14-3953/3990/15-3032

SOUTHERN REFRIGERATED TRANSPORT, INC.,

*Defendant-Appellant/Cross-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:10-cv-00994 —James L. Graham, District Judge.

Argued: August 6, 2015

Decided and Filed: November 5, 2015

Before: SUHRHEINRICH and MOORE, Circuit Judges; VAN TATENHOVE, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Thomas H. Dupree, Jr, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellant/Cross-Appellee. Marc Rubin, SPECTOR RUBIN, P.A., Miami, Florida, for Appellee/Cross-Appellant. **ON BRIEF:** Thomas H. Dupree, Jr, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., Joshua S. Lipshutz, GIBSON, DUNN & CRUTCHER LLP, San Francisco, California, Timothy P. Roth, Joseph W. Pappalardo, GALLAGHER SHARP, Cleveland, Ohio, for Appellant/Cross-Appellee. Marc Rubin, SPECTOR RUBIN, P.A., Miami, Florida, Kendra L. Carpenter, FREYTAG CARPENTER LLC, Columbus, Ohio, for Appellee/Cross-Appellant.

---

[*]The Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

---

**OPINION**

---

SUHRHEINRICH, Circuit Judge.

## I.  INTRODUCTION

Plaintiff-Appellee/Cross-Appellant Exel, Inc. ("Exel"), a shipping broker, sued Defendant-Appellant/Cross-Appellee Southern Refrigerated Transport, Inc. ("SRT"), an interstate motor carrier, after SRT lost a shipment of pharmaceutical products it had agreed to transport for Exel on behalf of Exel's client, Sandoz, Inc. ("Sandoz").  The district court awarded Exel the replacement value of the lost goods pursuant to the transportation contract between Exel and SRT, rejecting SRT's argument that its liability was limited under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706, and the bills of lading.

SRT appeals.  Exel has filed a conditional cross-appeal.  We reverse and remand for further proceedings.

## II.  BACKGROUND

SRT is a motor carrier that provides transportation of cargo in interstate commerce.  Exel, a freight broker, arranges for the transportation of its customer's commodities.  In December, 2007, Exel and SRT executed a Master Transportation Services Agreement (MTSA).  The MTSA is a standard agreement that Exel executes with any carrier it hires to transport its clients' goods.[1]  It establishes non-exclusivity, delineates various delivery terms, sets forth the billing arrangements and insurance requirements, and prescribes other terms that govern the parties' ongoing relationship.  It does not contain shipment-specific terms.

Section 4 of the MTSA states that Exel will issue freight receipts for each shipment. Further, "[i]f a bill of lading is issued as a freight receipt, any terms, conditions or provisions" in the bill of lading "shall be subject to and subordinate to the terms of" the MTSA, and "in the

---

[1]The MTSA designates SRT as the "Carrier" and Exel as the "Customer."  It generally defines "Shipper" as "the underlying shipper(s) (Customer's principal(s)) of the Commodities."

event of a conflict," the MTSA "shall govern."  The MTSA also provides that SRT "shall be liable" to Exel for any "loss" to commodities shipped pursuant to the agreement, and that the "measurement of the loss . . . shall be the Shipper's replacement value applicable to the kind and quantity of Commodities so lost . . . ."

Sandoz, who is not a party to this litigation, is one of Exel's customers.[2]  In November, 2008, Exel arranged for SRT to transport a shipment of Sandoz's pharmaceuticals from Exel's warehouse in Mechanicsburg, Pennsylvania, to Memphis, Tennessee.  Before the shipment, Exel prepared five documents, designated as bills of lading, on Sandoz's behalf.  Exel personnel loaded the pharmaceuticals onto SRT's container.  Exel personnel signed the bills of lading and gave them to the SRT driver, who also signed them.

The bills of lading include the number of units to be transported, the weight of each shipment, and special instructions for delivery.  In the section labeled "KIND OF PACKAGES, DESCRIPTION OF ARTICLES SPECIAL MARKS EXCEPTIONS" the freight is designated as "Drugs or Medicines Non Hazardous."  The freight is labeled "Item 60000 Class 85, RVNX $2.40."  Neither of the latter terms is defined in the bills of lading.

The bills of lading contain the following "certification" language:

> Carrier, SFRI . . . RECEIVED, *subject to the classifications and Tariff, in effect on the date of issue of this bill of lading* . . . The Proper[sic] described below, in apparent good order, . . . which said carrier . . . agrees to carry . . . that every service to be performed here-under shall be subject to all terms and conditions of the Uniform Domestic Straight Bill of Lading . . . in the applicable motor carrier classification or tariff if this is a motor carrier shipment. *Shipper hereby certifies that he is familiar with all the said terms and conditions of the said bill of lading set forth in the classification or tariff which governs the transportation of this shipment and the terms and conditions are hereby agreed to by shipper and accepted by himself and his assigns.*

(Emphases added).  The bills of lading also have a "declared value" box:

---

[2]The contract between Sandoz and Exel is not in the record.

NOTE-Where the rate is dependant [sic] on value, shippers are required to state specifically in writing the agree[sic] or declared value of property. The agreed or declared value on the property is hereby specifically stated by the shipper not to be not exceeding ___ per ___.

No value is declared on the bills of lading.

"RVNX" is not defined in the bills of lading. According to SRT, RVNX is an abbreviation for "Released Value Not to Exceed"—it is a per pound limit of liability for any claim against the carrier related to the loss or damage of the cargo, calculated by multiplying the per-pound limit of liability by the weight in pounds of the cargo.

On November 7, 2008, the SRT truck carrying the Sandoz shipment was stolen and the goods were never recovered. On November 14, 2008, Sandoz made a claim for the lost goods with Exel.

The November lost shipment was not the first cargo loss involving Sandoz, Exel, and SRT. Three months prior, on August 24, 2008, a SRT truck carrying Sandoz's cargo was stolen near Memphis, Tennessee, and the goods were never recovered. Exel submitted a written notice of claim to SRT pursuant to the MTSA, seeking full value recovery of the August shipment based on replacement cost for the shipment, which SRT paid (although the amount at issue was much less). Also after the August 24 theft, SRT allegedly agreed to assign Sandoz-Exel shipments to SRT's Constant Security Program (CSP), which requires that a truck never be left unattended. Exel admits that neither Exel nor Sandoz paid SRT for any special handling under the CSP, but maintains that "SRT apparently chose to absorb the cost of the CSP in order to keep" Exel's business.

Thus, on December 9, 2008, Exel submitted on behalf of Sandoz a claim to SRT pursuant to the MTSA demanding the full replacement value of the November shipment, $8,583,631.10. This time SRT denied the claim, stating that its recovery was limited to $56,766.36, based on the terms in the bills of lading, namely the "RVNX $2.40", times the weight of the cargo. In a letter dated January 29, 2009, Martin Gargiule, Director of Finance in Business Planning and Analysis Group for Sandoz, reiterated its position that "Sandoz holds Exel fully liable for the Claim, and demands payment for the claim in the amount of $8,585,631.10," and that "Sandoz therefore

rejects Exel's position that it is not liable for the loss, or that Sandoz must look to the carrier for recovery."

On October 18, 2010, Sandoz assigned its rights and interests in the second lost cargo to Exel. On November 5, 2010, Exel, "for the use and benefit of" Sandoz, filed a complaint against SRT, alleging (1) breach of contract (Count I); (2) breach of bailment (Count II); (3) breach of the ICC Termination Act (previously the Carmack Amendment) (Count III); and (4) a request for a declaratory judgment to determine "whether the terms of the Agreement or the terms of the bills of lading govern the claim for damages in this matter" (Count IV). Exel sought $8,583,671.12 in damages.

SRT filed its answer and motion for judgment on the pleadings as to Counts I, II, and IV of the complaint. In the motion SRT argued that the Carmack Amendment, 49 U.S.C. § 14706, *et seq.*, governed the relationship between the parties and preempted Counts I, II, and IV. The district court ruled on SRT's motion for judgment on the pleadings on December 15, 2011, holding that the Carmack Amendment preempted Counts I and II. It therefore granted judgment to SRT on those counts. The district court found it unnecessary to address the declaratory judgment question in Count IV, reasoning that a declaration would not settle the initial question of whether SRT was, in the first place, liable under the Carmack Amendment for the loss of the shipment. Count III remained pending.

The parties filed cross-motions for summary judgment as to Count III. After oral arguments on the motions, the court, *sua sponte* reversed its decision as to Count IV. The court remarked that it had "viewed this case as one in which Exel stands in the shoes of the shipper Sandoz with rights no greater than those which could be asserted by Sandoz," but that at the May 23, 2012 hearing, Exel had also asserted separate and additional rights under the MTSA. The district court "examined the MTSA" and found "that it does contain language which may create obligations independent of the shipper-carrier relationship" outside the purview of the Carmack Amendment. The court referenced the provision giving the MTSA trump power over conflicting bills of lading, as well as the provisions making the carrier liable to the Customer for loss, measured by the replacement value. The district court "also re-examined the complaint" and held that "in its claim for declaratory judgment Exel did articulate a claim of individual rights

under the MTSA," finding that "[t]hese factual allegations would be sufficient to support a claim for breach of contract." The district court then amended its earlier order and concluded: "[Exel] has alleged a claim for breach of contract based on the provisions of the MTSA, which may not be preempted by the Carmack Amendment." The court ordered the parties to file supplemental briefs.

Following supplemental briefing, the court held on July 27, 2012, that the Carmack Amendment did not preempt Exel's breach of contract claim under Count IV, observing that the Carmack Amendment does not expressly preempt state law claims between a broker and a carrier. The district court also rejected SRT's argument that, absent preemption of Exel's contract claim, it could be subject to double recovery. The court found that was "not a possible outcome of this case," because Sandoz had assigned its claim for the lost cargo to Exel. Thus, SRT "need not be concerned by a separate action by Sandoz, and Exel seeks recovery here either under the bill of lading or the master agreement, not both." The district court therefore vacated its order of December 15, 2011 with respect to Count IV and denied SRT's motion for judgment on the pleadings as to that count. The court denied the parties' motions for summary judgment without prejudice.

After additional discovery, the parties submitted new motions for summary judgment. On August 26, 2014, the district court held that the MTSA was an enforceable contract, which Exel had standing to enforce. It also held SRT was responsible for the replacement value of the lost goods under the plain language of the MTSA, in the amount of $5,890,338.82, based on the submissions of Gargiule.[3] The district court therefore granted Exel's motion for summary judgment as to Count IV for that amount. The court dismissed Count III, apparently as duplicative, because it noted in a footnote that "the Carmack Amendment claim for the use and benefit of Sandoz is an alternative claim to Exel's individual breach of contract claim."

This appeal and cross-appeal follow.

---

[3]Exel represented that the actual value of the shipment was $8,583.631.10.

## III. Analysis[4]

We review a district court's grant of summary judgment de novo. *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 825 (6th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### A. Exel's Breach of Contract Claim

The district court concluded that Exel stated a breach of contract claim on its own behalf in Count IV.[5] As noted, the district court originally perceived Exel as asserting only claims assigned to it by Sandoz, but later revised its decision to hold that Exel stated a claim for breach of the MTSA on its own behalf in Count IV. The court further concluded that the plain language of the MTSA established that SRT was liable to Exel for the loss of the pharmaceuticals. The court relied on the section entitled "Liabilities and Claims for Commodities," which states in relevant part that "Carrier shall be liable to Customer for loss . . . to the Commodities tendered to Carrier for transportation hereunder while the Commodities are in its . . . custody . . . [and that] [t]he measurement of the loss . . . shall be the Shipper's replacement value . . . ." The district court ruled that Exel had standing to pursue its breach of contract claim, because Exel "incurred significant liability as a direct consequence of" the loss of the pharmaceuticals, based on Sandoz's January 29, 2009 letter to Exel. In that letter Garguile reiterated Sandoz's position that "Sandoz holds Exel fully liable for the Claim, and demands payment for the claim in the amount of $8,585,631.10," and that "Sandoz therefore rejects Exel's position that it is not liable for the loss, or that Sandoz must look to the carrier for recovery."

SRT claims that the district court was wrong because (1) the complaint does not assert a breach of contract action on behalf of Exel; (2) even if it did, Exel lacks standing because it

---

[4]The district court had federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the suit arises under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706. The district court also had diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Exel and SRT are citizens of different states and the amount in controversy exceeds $75,000.

[5]In the complaint Exel also states it is filed "f/u/b/o" Sandoz. Nonetheless, parties are generally not allowed to claim relief based on the legal rights or interests of third parties, and Exel has not asserted that Sandoz is incapable of asserting rights on its own behalf. *See Kochins v. Linden-Alimak, Inc.*, 799 F.2d 1128, 1137 (6th Cir. 1986).

suffered no injury; and (3) any such claim is preempted by the Carmack Amendment. SRT asks us to vacate the judgment and remand with instructions that the Carmack Amendment provides the exclusive cause of action, and that SRT's liability may not exceed the liability limitation set forth in the applicable bills of lading. We agree that Exel lacks standing to enforce the MTSA because it suffered no injury and that the Carmack Amendment provides the exclusive cause of action in this case. We therefore reverse the district court on this basis.

SRT argues that the January 29 letter is insufficient to establish Exel's standing because (1) this is not an indemnification action; (2) Exel has acknowledged that it has not paid any money to Sandoz as a result of the lost goods; (3) Exel refuses to concede that it will be contractually liable to Sandoz; and (4) the district court itself acknowledged that "it is unclear from the record whether Exel is contractually liable to Sandoz for the lost pharmaceuticals," because the parties have not submitted any contract between Exel and Sandoz indicating that Exel is liable to Sandoz.

Exel maintains that the MTSA is a "contract to pay" rather than an indemnity contract, citing *Dana Corporation v. Celotex Asbestos Settlement Trust*. Applying Ohio law, *Dana Corp.* stated that, unlike a contract to indemnify, where damage must be shown before the indemnitee is entitled to recover, "'if there is an agreement to stand for a debt or to pay a sum certain, then it is no defense that the indemnitee has suffered no loss.'" *Dana Corp. v. Celotex Asbestos Settlement Trust*, 251 F.3d 1107, 1116 (6th Cir. 2001) (quoting *In re Highland Grp.*, 136 B.R. 475, 478 (Bankr. N.D. Ohio 1992)).

Although the district court did not use the term "contract to pay," it held that the plain language of the MTSA "reflect[ed] the parties' allocation of risk among themselves. In this instance, the parties agreed that SRT would be liable to Exel for any loss of cargo." This reasoning is flawed, however, because Exel is seeking to recover from SRT alleged losses arising directly from the lost cargo—losses Exel never suffered. Furthermore, absent a contractual agreement between Exel and Sandoz requiring Exel to reimburse Sandoz for the lost goods, SRT's liability under the MTSA to pay Exel for any "loss . . . to the Commodities" was not triggered. *See Dana Corp. v. Fireman's Fund Ins. Co.*, 169 F. Supp. 2d 732, 736-37 (N.D. Ohio 1999) (noting that contracts to pay provide a right of action "as soon as the debt matures and is

unpaid" and that indemnification contracts provide a right of action only after the indemnitee has suffered a loss) (quoting *Henderson-Achert Lithographic Co. v. John Shilling Co.*, 60 N.E. 295 (Ohio 1901)), *aff'd sub nom. Dana Corp. v. Celotex Asbestos Settlement Trust*, 251 F.3d 1107, 1114-16 (6th Cir. 2001).

And even if this were an indemnification action, Exel is not seeking to recover from SRT any money that Exel has paid to Sandoz. It is axiomatic that to establish standing a plaintiff must have suffered an injury in fact—an invasion of a legally-protected interest, i.e. "an invasion of a legally-protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations and footnote omitted). Absent any showing that Exel itself suffered a loss (directly or in an indemnification contract with Sandoz), Exel lacks standing to pursue a claim in its own right for loss of the pharmaceutical products. *See Hollingsworth v. Perry*, ⸺ U.S. ⸺, 133 S.Ct. 2652, 2662 (2013) (quoting *Lujan*, 504 U.S. at 560 n.1) ("To have standing, a litigant must seek relief for an injury that affects [the plaintiff] in a 'personal and individual way.'"). Based on the record before the court, Exel has no obligation to pay Sandoz any damages for the lost cargo. Therefore, Exel does not have standing to sue for breach of contract damages under the MTSA.

Given our resolution of this issue on standing grounds, we need not address SRT's claims that the complaint did not state a breach of contract claim on Exel's behalf or that such a claim is preempted by the Carmack Amendment.

**B. Exel's Carmack Amendment Claim**

Although Exel maintains that the contract between Exel and SRT is a brokerage agreement outside the scope of Carmack preemption, it asserts that even if it did apply, the statute expressly permits parties to enter into contracts other than bills of lading setting forth their rights and responsibilities. Thus, Exel contends that it has a right to bring a Carmack claim against SRT pursuant to the MTSA.**[6]** This raises the question of whether Exel, a non-shipper

---

**[6]**Count III alleges that "SRT owed to Exel a statutory duty to deliver the Shipment in the same good order and condition as it was delivered," that "SRT breached its duty of care by failing to properly deliver the subject

broker, can sue under the Carmack Amendment on its own behalf. (Exel preserved this issue in its conditional cross-appeal).

The Carmack Amendment, enacted in 1906 as an amendment to the Interstate Commerce Act, 24 Stat. 379, created a national scheme of carrier liability for loss or damages to goods transported in interstate commerce. *See Adams Express Co. v. Croninger*, 226 U.S. 491, 503-06 (1913). The Amendment restricts carriers' ability to limit their liability for cargo damage. It makes a motor carrier fully liable for damage to its cargo unless the shipper has agreed to some limitation in writing. 49 U.S.C. § 11706(a), (c), § 14101(b). Making carriers strictly liable relieves shippers of the burden of determining which carrier caused the loss as well as the burden of proving negligence. *Certain Underwriters at Interest at Lloyds of London v. UPS*, 762 F.3d 332, 335 (3d Cir. 2014). Carriers in turn acquire reasonable certainty in predicting potential liability because shippers' state and common law claims against a carrier for loss to or damage were preempted. *Id*.

Section 14706(a)(1) makes the carrier liable to the person entitled to recover under the receipt or bill of lading. 49 U.S.C. § 14706(a)(1). Nothing in the Carmack Amendment suggests that Congress also intended to protect the broker-carrier relationship by granting brokers[7] a direct right to sue under the statute. *See Edwards Bros., Inc. v. Overdrive Logistics, Inc.*, 581 S.E.2d 570, 572 (Ga. Ct. App. 2003) (stating that "the Carmack Amendment was enacted to protect the rights of shippers suing under a receipt or bill of lading, not brokers"); *cf. Transit Homes of Am., Div. of Morgan Drive Away, Inc. v. Homes of Legend, Inc.,* 173 F. Supp. 2d 1185, 1187–88 (N.D. Ala. 2001) (holding that Carmack Amendment, by its terms, makes carriers liable to shippers but does not create corresponding remedy for a carrier to sue a shipper for freight charges due under a contract). Indeed, under the plain terms of the statute, only a "shipper and carrier" can enter into an agreement waiving rights under the statute. *See* § 49 U.S.C. § 14101(b)(1) ("If the shipper and carrier, in writing, expressly waive any or all rights and

---

merchandise," and that "[a]s a result of this breach, Exel was damaged in the amount of $8,583,671.12, the value of the Shipment."

[7]The Interstate Transportation Act defines "broker" as "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2).

remedies under this part for the transportation covered by the contract, the transportation provided under the contract shall not be subject to the waived rights and remedies and may not be subsequently challenged on the ground that it violates the waived rights and remedies.").

In short, the Carmack Amendment does not provide Exel, as a non-shipper broker, with a direct cause of action. Thus, Exel cannot sue under the Carmack Amendment for breach of the MTSA. And, as noted, Exel would lack standing to assert such a claim anyway, because it has not suffered a loss under the MTSA.

**C. The Assigned Claim**

But Exel is also the assignee of Sandoz's claims against SRT under the bills of lading. *See Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 672 F.3d 434, 439 (6th Cir. 2012) (stating that assignee stands in the shoes of the assignor and assumes the same rights, title, and interest possessed by the assignor).[8] As assignee of those rights, Exel has standing to bring a Carmack claim. *See, e.g., R.E.I. Transp., Inc. v. C.H. Robinson Worldwide, Inc.*, No. 05-57-GPM, 2007 WL 854005, at *5-6 (S.D. Ill. Mar. 16, 2007) (broker, after it paid shipper's claim and received an assignment, was entitled to recover against carrier under the Carmack Amendment for the value of the lost goods); *see also OneBeacon Ins. Co. v. Haas Indus., Inc.*, 634 F.3d 1092, 1098-99 (9th Cir. 2011) (property insurer, as subrogee of owner of property, had standing to sue carrier under the Carmack Amendment). Exel has preserved this issue in its conditional cross-appeal.

The plain language of the Carmack Amendment makes the carrier strictly liable "for the actual loss or injury to the property" caused by the carrier *unless* the carrier limits its liability "to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances

---

[8]The Assignment provides that "[f]or valuable consideration," Sandoz "assigns to Exel, Inc. . . . any and all actions, causes of action, claims, and demands of every kind and nature whatsoever, in law or in equity, which [Sandoz] may have . . . against Southern Refrigerated Transport, Inc., . . . based in whole or in part upon the loss/shortage to cargo identified in Sandoz Inc. invoices . . . transported by CARRIER under bills of lading . . . dated November 7, 2008 . . . ." The document does not state, and the record does not otherwise reflect, what that "valuable consideration" was. However, under New York law, "[a]n assignment shall not be denied the effect of irrevocably transferring the assignor's rights because of the absence of consideration, if such assignment is in writing and signed by the assignor, or by his agent." N.Y. Gen. Oblig. Law § 5-1107 (McKinney 2015); *see also Sherwood v. Brock*, 884 N.Y.S.2d 793, 795 (N.Y. App. Div. 2009).

surrounding the transportation." 49 U.S.C. § 14706(a), (c)(1)(A). To limit its liability to an amount less than the actual value of the lost or damaged goods, the current version of the Carmack Amendment further requires the carrier, "on request of the shipper," to provide "a written or electronic copy of the rate, classification, rules, and practices upon which any rate applicable to a shipment, or agreed to between the shipper and the carrier, is based." 49 U.S.C. § 14706(c)(1)(B).

Thus, the "default posture" of the Carmack Amendment is full liability on the carrier. *ABB Inc. v. CSX Transp., Inc.*, 721 F.3d 135, 142 (4th Cir. 2013). The limited liability of subsection (c)(1)(A) "is a very narrow exception to the general rule." *Toledo Ticket Co. v. Roadway Express, Inc.*, 133 F.3d 439, 442 (6th Cir. 1998) (relying on earlier provision of the statute).[9]

SRT argues that the bills of lading are the only "contracts" between Sandoz and SRT, and establish that SRT's liability was limited to "RVNX $2.40," or $56,766.36, under the Carmack Amendment.[10] SRT further maintains that, because Sandoz was not a party to the MTSA, this contract does not govern SRT's liability to Sandoz. And even if the MTSA applies, the bills of lading and MTSA should be read together such that the "replacement value" in ¶ 9(b) of the MTSA is capped by the bills of lading. Exel, in turn, argues that even if the Carmack Amendment applies, the MTSA still governs because the MTSA is a "written agreement" limiting liability under § 14706(c)(1)(A). Furthermore, Exel claims that Sandoz was a third-party beneficiary of the MTSA and that the agreement may therefore be enforced on Sandoz's behalf. *Id.* at 34.

Both positions have problems. Exel's argument glosses over the fact that the only written agreement in the record signed by Sandoz (or more precisely, Sandoz's representative, Exel) is in the bills of lading. As discussed above, the MTSA is not a "written agreement" limiting liability under § 14706(c)(1)(A), because it was not executed by the shipper, Sandoz, and the carrier,

---

[9]The Carmack Amendment was initially enacted in 1906 and codified at 49 U.S.C. § 11707. Under the ICC Termination Act of 1995, which became effective January 1, 1996, the Carmack Amendment was revised, recodified, and replaced by 49 U.S.C. § 14706.

[10]A bill of lading "records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage." *Norfolk S. Ry. v. James N. Kirby, Pty Ltd.*, 543 U.S. 14, 18-19 (2004).

SRT. *See* § 14706(c)(1)(A). The MTSA is also not a "value established by written or electronic declaration of the shipper," the other way a carrier can limit liability under § 14706(c)(1)(A). *Id.* Absent a written agreement with Sandoz binding Sandoz to the terms in the MTSA, Exel and SRT could not limit liability for the lost shipment through the MTSA.

For the same reason, the fact that Sandoz may be a third-party beneficiary of the MTSA (and we do not suggest that this is true) is irrelevant. The Carmack Amendment preempts state common law, and, as just noted, prevents the carrier from limiting its liability without the express written consent of the shipper. Thus, an agreement between a carrier and broker that does not establish the shipper's assent cannot set the carrier's liability, even if the shipper is a third-party beneficiary of the agreement under state law. To allow otherwise would allow a carrier and broker to circumvent the written requirement of the Carmack Amendment based on state third-party beneficiary law. In short, the plain language of the statute governs, and because it prohibits a carrier from limiting liability without the written consent of the shipper, the MTSA in this case does not establish SRT's liability for the lost shipment.

Thus, the issue is whether SRT's liability is effectively limited in the bills of lading. Contrary to SRT's assertion, the term "RVNX $2.40" is not conclusive. According to Jerry McEntire Jr, Operations Specialist at SRT (formerly a Customer Service Relations Manager at the time of the lost shipment), "ITEM 60000 CLASS 85" refers to the category of freight defined by the National Motor Freight Traffic Association. McEntire further explained that "RVNX" is an abbreviation of "Released Value Not to Exceed," and "is used to designate a per pound limit of liability of any claim against the carrier in the event that the cargo is lost or damaged in transit." Exel, however, submitted the affidavit of John Hecker, Exel's Transportation Manager, who stated that RVNX "is a freight classification which has been programmed into Exel's computer. . . . There is no declaration of the value of the property on the freight receipt since the freight rate is not dependent upon value." In other words, Exel asserts that the bills of lading are merely freight receipts and not evidence of a written agreement to limit liability between Sandoz and SRT. No other evidence suggests what the parties intended "RVNX $2.40" to mean.

Furthermore, this court and other courts have held that, in order to limit its liability under the Carmack Amendment, a carrier must: (1) maintain approved tariff rates with the ICC;

(2) provide the shipper with a fair opportunity to choose between two or more levels of liability; (3) obtain the shipper's written agreement as to its choice of liability; and (4) issue a receipt or bill of lading prior to moving the shipment. *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 715 (6th Cir. 1999); *Toledo Ticket Co.*, 133 F.3d at 442;[11] *see also Emerson Elec. Supply Co. v. Estes Express Lines Corp.*, 451 F.3d 179, 186 (3d Cir. 2006) (citing cases); *Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc.*, 331 F.3d 834, 841 n.3 (11 Cir. 2003); *Hughes Aircraft Co. v. N. Am. Van Lines, Inc.*, 970 F.2d 609, 611-12 (9th Cir. 1992). The burden is on the carrier to prove that it complies with these requirements. *OneBeacon*, 634 F.3d at 1099.

Subsequent to our decision in *Toledo Ticket*, Congress eliminated the requirement that non-household goods carriers file tariffs with the Interstate Commerce Commission in the Trucking Industry Regulatory Reform Act of 1994 ("TIRRA"), Pub. L. No. 103–311, § 206, 108 Stat. 1673, 1684–85 (codified as amended as 49 U.S.C. §§ 10702, 10762(a)(1) (1994). Also, the ICC Termination Act of 1995 ("ICCTA"), Pub. L. No. 104–88, 109 Stat. 803 replaced § 11707 and § 10730 with § 14706, and added the subsection that requires carriers to "provide to the shipper, *on request of the shipper*, a written or electronic copy of the rate, classification, rules, and practices, upon which any rate applicable to its shipment or agreed to between the shipper and carrier is based." 49 U.S.C. § 13710(a)(1); *see also id*. § 14706(c)(1)(B) (emphasis added). The legislative history of the ICCTA states that § 14706(c)(1) "is intended to return to the pre-TIRRA situation where shippers were responsible for determining the conditions imposed on the transportation of a shipment." H.R. Rep. No. 104–422, at 223 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 850, 908; *see OneBeacon*, 634 F.3d at 1099; *Emerson*, 451 F.3d at 185; *Sassy Doll*, 331 F.3d at 84; *Emerson Elec. Supply Co. v. Estes Exp. Lines Corp.*, 324 F. Supp. 2d 713, 721-23 (W.D. Pa. 2004) (same, and providing a detailed history of the origins of the Carmack Amendment), *aff'd*, 451 F.3d 179 (3d Cir. 2006).

---

[11]Although the opinions in both cases were issued after the 1995 amendments took effect, both cases are based on events that occurred prior to the 1995 amendments. *EFS Nat'l Bank v. Averitt Express, Inc.*, 164 F. Supp. 2d 994, 1001 (W.D. Tenn. 2001).

Although the first requirement arguably is no longer viable after the 1995 amendments, *see OneBeacon*, 634 F.3d at 1099-1100,[12] as the Eleventh Circuit has observed, "[t]hose legislative changes are not inconsistent with the reasonable opportunity requirement, which has been part of Carmack Amendment jurisprudence for at least the past fifty years." *Sassy Doll*, 331 F.3d at 841. We agree with the Eleventh and Fourth Circuits that the "reasonable opportunity" requirement survives the 1995 revisions to the Carmack Amendment and therefore does not undermine *Toledo Ticket's* core holding that the carrier must give a shipper a fair opportunity to choose between levels of liability. *See Emerson*, 451 F.3d at 187-88 (holding that the 1995 amendments do not reflect an intent to alter the two or more levels of liability requirement); *Sassy Doll*, 331 F.3d at 841-42 (the 1995 amendments did not alter the requirement that carrier provide a shipper with a reasonable opportunity to choose between two or more levels of liability). Thus, under *Toledo Ticket* "a carrier must provide the shipper with both reasonable notice of any options that would limit the liability of the carrier and the opportunity to obtain the information about those options that will enable the shipper to make a deliberate and well-informed choice." *Toledo Ticket*, 133 F.3d at 442.

SRT has not met its burden on summary judgment of establishing that it provided Sandoz (or Sandoz's agent) with the opportunity to choose between two or more levels of liability as required by *Toledo Ticket*. SRT does not explain what "classification or tariff . . . govern[ed]" the November 7 shipment,[13] or indicate whether it made this information available to Sandoz, upon the shipper's request. And while the bills of lading allow the shipper to declare a value, they do not offer an option to choose a higher level of coverage or state that the carrier's liability

---

[12]The Ninth and Eleventh Circuits have stopped short of holding that the 1995 amendments *eliminated* the first requirement. The Fourth Circuit remarked that:

> We agree with the Eleventh Circuit that "the most that can be said about the latest version of the statute is that a carrier is now required to provide a shipper with the carrier's tariff if the shipper requests it, instead of the shipper [sic] filing its tariff with the now-defunct ICC." *Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc.*, 331 F.3d 834, 841 (11th Cir. 2003). Accordingly, we hold that the *Hughes* test remains the same with one exception: Instead of maintaining a tariff in compliance with the ICC, a motor carrier must now, at the shipper's request, provide the shipper with "a written or electronic copy of the rate, classification, rules, and practices upon which any rate applicable to a shipment, or agreed to between the shipper and the carrier, is based."

*OneBeacon*, 634 F.3d at 1100.

[13]The Fourth Circuit has explained that "[t]he term 'tariff,' even when still used by shippers and carriers out of habit,' is now merely a contractual term with 'no effect apart from [its] status as a contract.'" *ABB*, 721 F.3d at 138 (quoting *Tempel Steel Corp. v. Landstar Inway, Inc.*, 211 F.3d 1029, 1030 (7th Cir. 2000)).

might be limited. *See ABB*, 721 F.3d at 144 (holding that bill of lading did not establish limitation of liability, despite certification language and declared value box, where the bill of lading did not specifically reference a separate price list, did not include a price for shipment or indicate level of liability assumed by carrier and the shipper was unfamiliar with the price list); *Emerson*, 451 F.3d at 188 (holding that carrier failed to limit its liability where tariff did not provide an option to declare a higher value with a corresponding level of liability); *Sassy Doll*, 331 F.3d at 842-43 (although carrier-prepared bill of lading had a declared value box, it did not contain a space for requesting excess liability coverage and therefore did not give the shipper a reasonable opportunity to choose between two or more levels of liability); *cf. OneBeacon*, 634 F.3d at 1100 (holding that carrier met its burden by providing evidence that it had established standard rates, which incorporated the limitation of liability at issue in the bill of lading, as well as a separate excess valuation charge for full liability; bill of lading and conditions of contract carriage also clearly stated that the carrier's liability was limited to $50 or $0.50 per pound absent a higher declared value). Thus, SRT has not met its initial burden of demonstrating an absence of a genuine issue of material fact to justify the grant of summary judgment in its favor. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

On the other hand, the bills of lading at issue were drafted *by the shipper*, Sandoz (actually the shipper's representative, Exel), a "sophisticated business entit[y]" in the shipping business. Sandoz not only "certif[ied]" that it was "familiar with" and "agreed to" all the said terms and conditions of the said bill of lading set forth in the classification or tariff which governs the transportation of this shipment," but inserted the terms "Item 60000 Class 85, RVNX $2.40," and did not declare a value in the declared value box. Although not dispositive in the Carmack Amendment context, *see ABB,* 721 F.3d at 142 ("The text of the Carmack Amendment imposes full liability on carriers, without regard to which party prepared the bill of lading."); *see also id*. at 145 (stating that "we are bound by the express language of the Carmack Amendment, which puts the burden on the carrier to demonstrate that the parties had a written agreement to limit the carrier's liability, irrespective whether the shipper drafted the bill of lading"),[14] the fact that the shipper drafted the bills of lading is relevant in ascertaining whether

---

[14]*ABB* involved a rail carrier, which is subject to the 49 U.S.C. § 11706. The provision for motor carriers, 49 U.S.C. § 14706, is virtually identical.

the shipper was offered, and agreed to, a limitation of liability by the carrier. *See, e.g., Siren, Inc. v. Estes Express Lines*, 249 F.3d 1268, 1271-73 (11th Cir. 2001) (holding that shipper who prepared bill of lading could not avoid limitation of liability it had included in the contract where shipper used term understood in trucking industry as limiting liability to a certain amount per pound of cargo despite its claim that it did not have actual knowledge that the class designation was a limitation of liability because shipper was aware that it received a significant discount from the carrier's full liability rate for the shipment); *Hughes*, 970 F.2d at 612 (holding that a shipper who drafted a bill of lading and negotiated its terms was subject to liability limitation). In sum, whether SRT's liability is limited by the bills of lading is a question of fact, for resolution in the first instance by the district court.

For these reasons, we reinstate Count III, but only as to Exel's claim as assignee of Sandoz, and remand for further proceedings.[15]

## IV.  CONCLUSION

For the foregoing reasons, we vacate the district court's judgment and remand for further proceedings consistent with this opinion.

---

[15]Exel also argues that, even if the bills of lading trump the terms of the MTSA, the limitation of liability in the former would be invalid due to SRT's breach of the CSP, which the driver violated by leaving the vehicle unattended immediately prior to the loss.  Exel argues that the "material deviation" doctrine precludes limitation defenses where motor carriers have agreed, separate and apart from the standard contract of carriage, to provide coverage for the cargo.  The "material deviation" doctrine provides that where the shipper has paid an additional charge for special shipment provisions to reduce the risk of damage and the carrier fails to perform those very measures, resulting in damage to the cargo, the shipper is not bound by the contract and the limited liability provision may be rescinded.  *See Praxair, Inc. v. Mayflower Transit Inc.*, 919 F.Supp. 650, 656 (S.D.N.Y. 1996). The district court did not address this issue and the record is not sufficiently developed at this point for us to consider it.  We note only that Exel did not sue SRT for breach of a separate CSP agreement and Exel admits that neither Exel nor Sandoz paid for any special handling under the CSP.