**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-1940**

---

CARRA JANE PENEGAR, Executrix of the Estate of Johnny Ray Penegar, Jr., individually and on behalf of others similarly situated,

      Plaintiff – Appellant,

  v.

LIBERTY MUTUAL INSURANCE COMPANY; LIBERTY MUTUAL FIRE INSURANCE COMPANY,

      Defendants – Appellees.

---

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Robert J. Conrad, Jr., District Judge.  (3:20−cv−00585−RJC−DCK)

---

Argued:  December 5, 2023            Decided:  August 19, 2024

---

Before GREGORY, RICHARDSON, and RUSHING, Circuit Judges

---

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judge Gregory and Judge Rushing joined.

---

**ARGUED:**  Vernon Rollins Sumwalt, THE SUMWALT GROUP, Charlotte, North Carolina, for Appellant.  Mihaela Cabulea, BUTLER WEIHMULLER KATZ CRAIG, LLP, Tampa, Florida, for Appellees.  **ON BRIEF:**  John Hughes, Mona Lisa Wallace, William Graham, Ed Pauley, WALLACE & GRAHAM, PA, Salisbury, North Carolina, for Appellant.  Matthew J. Lavisky, BUTLER WEIHMULLER KATZ CRAIG LLP, Tampa, Florida, for Appellees.

RICHARDSON, Circuit Judge:

Carra Penegar appeals the district court's dismissal of her suit for lack of Article III standing. She argues on appeal that the district court erred by failing to recognize several injuries she sustained that establish her standing to sue. But we find that Penegar has not suffered a cognizable injury in fact that existed when she filed suit. We therefore affirm the district court's order.

## I.      Background

### A.      The Medicare Secondary Payer Act

We begin with the Act under which Penegar's claim arises. Medicare is a federal health-insurance program that provides benefits to individuals who are sixty-five or older, are disabled, or have end-stage renal disease. *See* 42 U.S.C. § 1395c. Before 1980, Congress paid for a Medicare beneficiary's medical services, even if she was already covered by a primary health plan. *Netro v. Greater Balt. Med. Cen., Inc.*, 891 F.3d 522, 524 (4th Cir. 2018). But that changed with the passage of the Medicare Secondary Payer Act ("MSP Act"). *See* 42 U.S.C. § 1395y(b).[1] The MSP Act "inverted that system" by making Medicare the secondary payer for a beneficiary's medical services when payment is available from her primary plan. *Netro*, 891 F.3d at 524 (quoting *Humana Med. Plan, Inc. v. W. Heritage Ins.*, 832 F.3d 1229, 1234 (11th Cir. 2016)). Only if the Government

---

[1] Technically, the secondary-payer provisions of § 1395y(b) arose through a series of amendments beginning in 1980. *See* Omnibus Budget Reconciliation Act of 1980, Pub. L. No. 96-499, § 953, 94 Stat. 2599, 2647; *United States v. Blue Cross and Blue Shield of Mich.*, 726 F. Supp. 1517, 1519–20 (S.D. Mich. 1989) (explaining the development of the statute). It has become customary, however, to refer to the resulting statute as the "Medicare Secondary Payer Act." We follow that custom here.

determines that a primary plan has not paid or will not promptly pay will it conditionally pay a beneficiary up front for medical services. § 1395y(b)(2)(B)(i).[2]  But if the primary plan is later determined to be responsible for paying, the MSP Act requires the plan, or the entity to whom the primary plan has already paid the funds, to reimburse the Government for its expenditures. § 1395y(b)(2)(B)(ii).[3]

The MSP Act provides two mechanisms for enforcing a primary plan's recoupment obligation.  First, the United States may sue to recover the amount from the primary plan or from the individual or entity to whom the primary plan has paid the funds. § 1395y(b)(2)(B)(iii).  Second, and pertinent to our case, private parties may sue to recover double damages from a primary plan that has failed to provide for primary payment in accordance with the MSP Act. § 1395y(b)(3)(A).[4]  The ostensible purpose of this latter

---

[2] Payment must also be unavailable from workers' compensation, liability insurance, and no-fault insurance.  *See* § 1395y(b)(2)(A)(ii).

[3] The MSP Act also provides that "[t]he United States shall be subrogated (to the extent of payment made under this subchapter for such an item or service) to any right under this subsection of an individual or any other entity to payment with respect to such item or service under a primary plan." § 1395y(b)(2)(B)(iv).

[4] The precise scope of this cause of action is tricky.  Section 1395y(b)(3)(A) allows a litigant to recover damages "double the amount otherwise provided" when "a primary plan . . . fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A)."  *See Bio-Med. Applications of Tenn., Inc. v. Cent. States S.E. and S.W. Areas Health and Welfare Fund*, 656 F.3d 277, 285 (6th Cir. 2011) ("Paragraph (1) . . . essentially lays out a system of rules instructing when group health plans must pay for medical items and services. . . . Paragraph (2) . . . instructs when Medicare may or may not pay for medical items and services.")  The statute's use of a conjunctive—requiring a failure to comply with paragraphs (1) *and* (2)(A)—has caused understandable confusion about when a provider is liable under its terms.  *Compare id.* at 286–87 (holding that the cause of action only authorizes private suits when Medicare (Continued)

3

provision, we have found, is "to help the government recover conditional payments from insurers or other primary payers." *Netro*, 891 F.3d at 524 (quoting *Stalley v. Cath. Health Initiatives*, 509 F.3d 517, 524 (8th Cir. 2007)).

## B.    Facts

In 2013, Johnny Ray Penegar, Jr., was diagnosed with mesothelioma. He received extensive treatment for the condition, which was paid for in part by Medicare. Meanwhile, in 2014, he filed a workers' compensation claim ("life claim") against his employer, UPS, and its insurance carrier, Liberty Mutual Insurance Company ("Liberty Mutual"), before the North Carolina Industrial Commission ("NCIC"). But before the completion of his suit, he passed away, and his wife, Carra Jane Penegar (hereinafter "Penegar"), was appointed executrix of his estate. Penegar subsequently added a claim for death benefits ("death claim").

On April 15, 2016, the NCIC concluded that Liberty Mutual was liable for both claims. As part of Penegar's award, the NCIC ordered that "Defendants SHALL pay for all the medical treatment that Plaintiff received for his compensable mesothelioma, including but not limited to imaging, therapy, surgery, hospitalization, prescriptions, and mileage." J.A. 93. It further provided that, "[t]o the extent that deceased Plaintiff/deceased

---

makes conditional payments because a primary plan has discriminated against the beneficiary on the basis of her Medicare eligibility, in violation of paragraph (1)), *with DaVita Inc. v. Va. Mason Mem'l Hosp.*, 981 F.3d 679, 689–92 (9th Cir. 2020) (holding that the cause of action authorizes suit when a primary plan violates its obligation under either (1) or (2)). Although we have heard disputes brought under this cause of action, *e.g.*, *Netro*, 891 F.3d 522, we have never considered its full scope. But we need not, and indeed cannot, resolve this question today, since we ultimately dispose of this case on standing grounds.

Plaintiff's estate and/or any third party, including Medicare, paid for any such treatment, Defendants SHALL reimburse such payor(s) in full." *Id.* The Full NCIC affirmed this award in a separate opinion and order issued on December 8, 2016, and the North Carolina Court of Appeals affirmed that order on May 1, 2018. Afterward, Penegar appealed to the Supreme Court of North Carolina over a wage calculation issue, but the Court denied discretionary review on September 25, 2019.

On May 1, 2020, Penegar and Liberty Mutual entered into two agreements for settlement and release of both claims. Liberty Mutual agreed to pay Penegar a total of $18,500 for the two claims, and she in turn agreed to release Liberty Mutual from any further claims arising out of the North Carolina Workers Compensation Act relating to her husband's medical benefits. The agreement also stipulated that Liberty Mutual had "paid medical benefits" to Penegar and that there were therefore "no unauthorized or disputed medical expenses." J.A. 132–33. Finally, Liberty Mutual alleged that a $0 Medicare lien existed at the time of the agreement, but the parties agreed that Liberty Mutual would be responsible for any lien that arose again. The NCIC subsequently approved both agreements.

## C. Procedural History

On October 23, 2020, Penegar filed a putative class action complaint against Liberty Mutual in the Western District of North Carolina under the MSP Act.[5] In her First

---

[5] Penegar also joined Liberty Mutual Fire Insurance Company, Verisk Analytics, Inc., and ISO Claims Partners, Inc., as defendants. But after briefing on this appeal was completed, she dismissed her claims against Verisk Analytics, Inc., and ISO Claims Partners, Inc. The parties then filed corrected briefs.

5

Amended Complaint, Penegar alleged that, on October 5, 2020, the Centers for Medicare and Medicaid Services ("CMS") sent her a collection letter requiring her to reimburse Medicare $18,500 for her husband's treatment. She claimed that this occurred because Liberty Mutual had failed to reimburse Medicare for her husband's medical services and had falsely reported to Medicare that its payment obligation had terminated, despite the NCIC judgment and settlement agreements. Penegar sought, among other things, double damages under the MSP Act for Liberty Mutual's failure to reimburse Medicare.

Liberty Mutual subsequently moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) and (6). It alleged that Penegar lacked standing to sue under the MSP Act because she had not suffered an injury in fact and because the settlement agreements precluded relief. Liberty Mutual also presented evidence that on August 4, 2021 (after Penegar filed suit), it had fully reimbursed CMS for the outstanding Medicare lien.

On May 18, 2022, a magistrate judge found that Penegar lacked standing. On August 15, 2022, the district court adopted the report and recommendation and dismissed the suit for lack of subject matter jurisdiction. Penegar timely appealed.

## II.    Discussion

Article III of the Constitution limits the jurisdiction of federal courts to resolving "Cases" and "Controversies." U.S. Const. Art. III. § 2. For a case or controversy to exist, "the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)); Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983) (explaining that standing

6

asks the question, "What's it to you?"). A plaintiff has standing if he shows: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423. Together, these three requirements "confine[] the federal courts to a properly judicial role," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); that is, "decid[ing] only 'the rights of individuals,'" *TransUnion*, 594 U.S. at 423 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803)).

Here, our focus is on injury in fact. To restate, an injury in fact must be both concrete and particularized. *Id*. While an injury is particularized so long as it "affect[s] 'the plaintiff in a personal and individual way,'" an injury is only concrete if it is "real and not abstract." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (*quoting Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992)). An injury in fact can be tangible, such as a physical or monetary injury, or it can be intangible, such as emotional harm or a violation of one's constitutional rights. *See TransUnion*, 594 U.S. at 425. Yet for the latter to be concrete, the injury must have "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id*.

For its part, "Congress may 'elevate' harms" that were previously insufficient to justify suit "to actionable legal status" via statutory causes of action. *Id*. at 426 (quoting *Hagy v. Demers & Adams*, 882 F.2d 616, 622 (6th Cir. 2018)). But that does not mean that Congress can override Article III and expand federal court jurisdiction beyond its constitutional confines. No matter what right or cause of action a statute may grant a

7

plaintiff, she must still have an injury in fact to sue in federal court. *Spokeo*, 578 U.S. at 341 ("Article III standing requires a concrete injury even in the context of a statutory violation."); *TransUnion*, 594 U.S. at 426–27 ("[A]n important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law."). "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." *Casillas v. Madison Ave. Assoc., Inc.*, 926 F.3d 329 (7th Cir. 2019) (Barrett, J.).

The plaintiff bears the burden of establishing that she has standing. *Spokeo*, 578 U.S. at 338. At the pleading stage, that means that she "must 'clearly . . . allege facts demonstrating'" injury in fact, causation, and redressability. *Id*. (alteration in original). Generally, when evaluating subject matter jurisdiction, we treat the plaintiff's factual allegations as true unless the defendant challenges the veracity of those jurisdictional allegations. 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1350 (July 2024 update).[6] We also "accept as valid the merits of appellees' legal claims" when evaluating standing. *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022).

---

[6] The relevant factual allegations are not always confined to the four corners of the complaint. *Cf. United States ex rel. Oberg v. Pa. Higher Ed. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014). Among other things, we may consider "documents incorporated in the complaint by reference," *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007), "as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic," *Phillips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *cf.* 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* (Continued)

8

On appeal, Penegar argues that the district court erred in determining she lacks standing to sue Liberty Mutual for damages under the MSP Act.  Penegar argues that she has met her burden of establishing standing in multiple ways.  Yet none establishes she has an injury in fact, let alone one caused by Liberty Mutual's allegedly illegal conduct and redressable by Penegar's sought-after damages.  And she cannot invoke federal jurisdiction solely because the MSP Act grants her a cause of action.  We therefore affirm the district court's order.

**A.      Unlike in *Netro v. Greater Baltimore Medical Center, Inc.*, the NCIC did not order Liberty Mutual to pay the Medicare reimbursement directly to Penegar, so that case does not establish her standing to sue.**

Penegar first argues that our decision in *Netro v. Greater Baltimore Medical Center, Inc.*, 891 F.3d 522, establishes her standing to sue.  In *Netro*, a hospital performed surgery on a Medicare beneficiary, but complications arose, and the beneficiary died two years later.  *Id.* at 524–25.  Kathy Netro, the personal representative of the beneficiary's estate, eventually prevailed in a malpractice suit against the hospital in state court, securing a large damages award, part of which was designated as compensation to reimburse Medicare for its coverage of the beneficiary's treatments.  *Id.* at 525.  The hospital then arranged to pay Netro.  *Id.*  But before it could do so, Netro sued the hospital in federal court, alleging it violated the MSP Act by not yet paying the judgment.  *Id.*

On appeal, we held that Netro had Article III standing.  Netro suffered an injury in fact, we explained, because the hospital was judged liable for medical malpractice and

---

§ 1357 (July 2024 update).  Because the parties here properly rely on exhibits integral to the complaint, we consider those exhibits in this appeal.  *Cf. Oberg*, 745 F.3d at 136.

9

owed her money to reimburse Medicare. *Id.* at 526 ("This monetary liability was Netro's injury under the federal statute."). And it did not matter that Netro was required to immediately send that money to the Government, for the hospital still owed the money to Netro herself. *Id.*

Citing *Netro*, Penegar argues that she suffered a concrete injury because Liberty Mutual should have paid for her husband's medical care but failed to do so. But a key fact distinguishes Penegar's claim from Netro's. Unlike in *Netro*, the NCIC did not order Liberty Mutual to pay Penegar the funds that Liberty Mutual owed the Government. Rather, it ordered Liberty Mutual to pay those funds *directly to the Government*. J.A. 93 (providing that "Defendants SHALL reimburse [Medicare] in full"). And despite containing some broad language, *Netro*'s discussion regarding the plaintiff's injury held only that a Medicare beneficiary suffers an injury in fact when a primary plan is bound by judgment to pay *the beneficiary* funds and fails to do so, even if the funds are ultimately owed to Medicare. *Netro*, 891 F.3d at 526 ("That Netro was legally obligated to pass along the money to Medicare cannot erase the fact that [the hospital] *owed it to her*." (emphasis added)). Since Liberty Mutual was not obligated to pay Penegar the funds owed to Medicare, the failure to pay did not injure her like it did the plaintiff in *Netro*. So the case does not establish that Penegar has standing.[7]

---

[7] In a separate part of the opinion, we held that Netro also had derivative standing because the Government partially assigned its recoupment interest to Medicare beneficiaries like her. *Netro*, 891 F.3d at 526–28. In the proceedings below, Penegar only vaguely gestured towards this theory of standing. She also conceded at oral argument that she has not expressly advanced that argument on appeal, but she still maintains that it was (Continued)

> **B.**      **The CMS demand letter imposed only the risk of future harm, so it cannot establish standing for Penegar's damages suit.**

Penegar next points to the CMS letter to establish her standing. On October 5, 2020, CMS sent Penegar a demand letter. The letter provided that she was "required to repay the Medicare program $18,500.00" within sixty days of her receipt of the letter. J.A. 254–55. And it explained that if she did not pay within sixty days, she would have to pay interest on the remaining balance and could be subject to enforcement actions by the Government to recover the amount.[8] Penegar argues that this demand from CMS establishes her injury in fact.

Yet this argument also fails. To be sure, past monetary loss is a quintessential injury in fact. *TransUnion*, 594 U.S. at 425. But Penegar has not paid CMS a dime. Rather, she has been subjected only to the *risk* of monetary loss or Government enforcement. And while risk of future harm can establish an injury in fact sufficient to support standing for *injunctive* relief, *id.* at 426; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013), the Supreme Court recently held that it cannot, by itself, establish concrete injury to have standing to seek *damages* like Penegar's, *TransUnion*, 594 U.S. at 436 ("[I]n a suit for

---

implied in her argument. Yet "it is not the obligation of this court to research and construct legal arguments open to parties," and we will not hesitate to find that "perfunctory and underdeveloped arguments . . . are waived." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 727 (4th Cir. 2021) (quoting *Judge v. Quinn*, 612 F.3d 537, 557 (5th Cir. 2010)). We accordingly find that Penegar has forfeited any potential argument for derivative standing. *See TransUnion*, 594 U.S. at 436 n.7 ("The plaintiffs here have not relied on such a theory of Article III harm.")

[8] The letter also noted that she had 120 days to appeal and that Medicare would take no action while an appeal was being processed.

11

damages, the mere risk of future harm, standing alone, cannot qualify as a concrete harm . . . .").  Penegar does not allege receipt of the letter caused her any harm apart from the risk of monetary loss, let alone harm that amounts to a concrete injury in fact.  *See id.* at 436 n.7; *see also Brunett v. Convergent Outsourcing, Inc.*, 982 F.3d 1067, 1068 (7th Cir. 2020) ("A debtor confused by a dunning letter may be injured if she acts, to her detriment, on that confusion . . . .  But the state of confusion is not itself an injury.").  So Penegar cannot establish she has standing by pointing to the CMS letter.  Although it threatened future, concrete harm, Penegar has yet to suffer such harm and therefore did not sustain an injury in fact from the letter.[9]  *See, e.g.*, *Ojogwu v. Rodenburg Law Firm*, 26 F.4th 457, 463–64 (8th Cir. 2022); *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 824 (5th Cir. 2022); *Exel, Inc. v. S. Refrigerated Transport, Inc.*, 807 F.3d 140, 147–48 (6th Cir. 2015); *Trichell v. Midland Credit Mgmt. Inc.*, 964 F.3d 990, 997 (11th Cir. 2020).

## C.    Congress cannot manufacture an injury in contravention of Article III.

Penegar's next argument is that "Congress has the Constitutional authority to define an 'injury' through legislation for federal questions, notwithstanding *Spokeo*."  Opening Br. at 31.  Despite the fifteen pages Penegar dedicates to this argument in her brief, we can dispose of it summarily.  *TransUnion* explicitly holds that, "under Article III, an injury in

---

[9] The posture of this very case demonstrates the wisdom of this rule.  At the time Penegar brought this suit, she allegedly had an outstanding obligation to reimburse CMS for the conditional payments.  Yet Liberty Mutual claims, and Penegar does not contest, that it has since fully reimbursed CMS for the amount Penegar owed.  *See* J.A. 478–80; Reply Br. at 21 (conceding that Liberty Mutual "corrected the liability and paid Medicare").  It therefore appears that Penegar has been relieved of any obligation to repay CMS the sum.  So the risk of future monetary harm she claims never materialized.

law is not an injury in fact. Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." 594 U.S. at 427. We decline to accept Penegar's invitation to ignore binding caselaw.

> **D.**    **Liberty Mutual compensated Penegar for her husband's medical expenses prior to her filing this lawsuit, so she had no monetary injury from having to pay out-of-pocket Medicare expenses.**

Finally, Penegar argues that she has standing to sue because she paid money out-of-pocket that she otherwise would not have paid had Liberty Mutual timely paid in the first instance. Specifically, she alleges in her First Amended Complaint, "on information and belief," that she "incurred co-pays [and] deductibles" as a result of Liberty Mutual's failure to timely pay for her husband's medical care. J.A. 389. Penegar argues that this pocketbook injury establishes her injury in fact.[10]

Liberty Mutual argues that Penegar failed to adequately plead this alleged monetary injury in her complaint. But we need not decide this question. For even if she did, it still

---

[10] Penegar also argues that she received less money from Medicare than she would have received from Liberty Mutual had it paid for her husband's care in the first place. To support this alleged injury in fact, she relies on the Sixth Circuit's decision in *Bio-Medical Applications of Tennessee, Inc. v. Central States Southeast and Southwest Areas Health and Welfare Fund*, 656 F.3d 277. But that case was brought by a *medical provider* that treated a Medicare beneficiary and received less from Medicare for the provided services than it would have from the insurance company. *Id.* at 296 n.17 ("By allegedly being paid less by Medicare than it would have been paid by Central States, Bio-Medical suffered its own harm here."). Penegar, by contrast, is not a medical provider, so she did not receive any payment from Medicare that was less than a payment she would have received from Liberty Mutual. And insofar as she is arguing that her out-of-pocket expenses would have been less had Liberty Mutual paid in the first instance, she, as we explain, had already been compensated for any resulting injury prior to her initiation of this lawsuit.

13

does not establish her standing to sue. Whether a party has standing turns on whether she has a "requisite stake in the outcome *when the suit was filed*." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (emphasis added); *see also Lujan*, 504 U.S. at 570 n.4 ("[J]urisdiction is to be assessed under the facts existing *when the complaint is filed*." (emphasis added)). In other words, a plaintiff's alleged injury must exist at the time she files her complaint. But it is clear from the complaint and the incorporated documents that any out-of-pocket expenses Penegar suffered were redressed before she filed her complaint. When the NCIC initially entered judgment for Penegar, it concluded that Liberty Mutual was liable for "all the medical treatment that [Johnny Penegar] received for his compensable mesothelioma" and ordered Liberty Mutual to reimburse Johnny Penegar and his estate "[t]o the extent that [they] . . . paid for any such treatment."[11] J.A. 93. The Full NCIC affirmed this award and ordered Liberty Mutual to "pay medical compensation for all medical treatment incurred by [Johnny Penegar] for his compensable occupational disease." J.A. 118. Later, when the parties signed the settlement agreements, they stipulated that "Defendants have paid medical benefits" and agreed that "there are no unauthorized or disputed medical expenses" outstanding. J.A. 132–33. It is therefore clear that whatever out-of-pocket expenses Penegar incurred for her husband's medical treatment, Liberty Mutual was ordered to reimburse her and did reimburse her for these expenses before the pendency of this action. As such, this pocketbook injury had already been redressed and cannot establish Penegar's standing to bring this suit.

---

[11] As Penegar concedes, the settlement agreements did not "undo" the earlier awards from the NCIC. Opening Br. at 28.

14

\*        \*        \*

Standing doctrine is "a judicial virtue, an unwillingness to decide cases, no matter how attractive in achieving justice or preventing injustice, if the proper party is not before the court and a proper remedy is not available to that party." William Baude & Samuel L. Bray, Comment, *Proper Parties, Proper Relief*, 137 Harv. L. Rev. 153, 188 (2023). Though its requirements are often pesky, standing ensures that we, as judges, do not exceed the authority to decide cases and controversies conferred on us by the Constitution. Proceeding to the merits here would transgress the bounds of that authority. We therefore decline to do so. Accordingly, the district court's judgment must be

*AFFIRMED*.

15